## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BUYING FOR THE HOME, LLC,, <br><br>                Plaintiff, <br><br>          - vs. – <br><br> HUMBLE ABODE, LLC, JAMES <br> WICKERSHAM and KRIS <br> KITTERMAN,, <br><br>              Defendant. | CIVIL ACTION NO. <br> 03-CV-2783 (JAP) <br><br><br> MOTION RETURNABLE MARCH 13, <br> 2006 |

---

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

COLEMAN LAW FIRM
A Professional Corporation
Ronald D. Coleman (RC 3875)
Jane Coleman
Attorneys for Defendants
Humble Abode, LLC, James  L.
  Wickersham and Kris
  Kitterman
881 Allwood Road
Clifton, NJ  07012
(973) 471-4010

TABLE OF CONTENTS

Table of Authorities                                            iv

PRELIMINARY STATEMENT                                            1

STATEMENT OF FACTS                                               3

LEGAL ARGUMENT                                                  10

   I.  PLAINTIFF'S COMPLAINT SHOULD
       BE DISMISSED                                             10

       a.  Summary judgment standard                           10

       b.  Plaintiff's trademark claim
           should be dismissed                                 11

       1. TOTAL BEDROOM is a descriptive mark                  12

       2.  TOTAL BEDROOM has no secondary meaning              13

       3.  Plaintiff's claim of infringement by search
           engine is not supported by any facts in the
           record                                              15

       a.  Plaintiff's state law unfair competition
           claims should be dismissed                          16

       b.  Plaintiff's defamation and trade
           disparagement claims should be dismissed            16

   II. THE COURT SHOULD AWARD DEFENDANT
       SUMMARY JUDGMENT ON THE REMAINING COUNTERCLAIMS
       AND THIRD-PARTY CLAIMS                                   20

       b.  The HUMBLE ABODE registered trademark is
           enforceable                                         20

           1.  HUMBLE ABODE is inherently distinctive          21

           2.  HUMBLE ABODE has secondary meaning              22

       b. The HA Furniture Marks are enforceable
          as trademarks                                        23

           1. Plaintiff has admitted that the HA

Furniture marks are
trademarks                                    24

2. The HA Furniture Marks are enforceable
   as "dealer marks"                          25

3. Catalog designations such as the
   HA Furniture Marks are protectible as
   trademarks                                 26

c. Plaintiff is liable for false advertising and
   unfair competition under the Lanham Act    27

d. Plaintiff is liable for unfair competition under
   state law                                  28

1. Plaintiff has engaged in
   search engine trademark infringement       31

2. Plaintiff has engaged in infringement
   through palming off                        34

1) Plaintiff's unfair competition is
   not mitigated by its use of a
   disclaimer                                 35

e. Plaintiff's filing of a meritless
   lawsuit constituted unfair competition
   under the Lanham Act and New Jersey law    36

f. Defendant can prove damages caused by
   plaintiff's conduct                        38

CONCLUSION                                     40

TABLE OF AUTHORITIES

<u>Cases</u>                                                                  <u>Page</u>

*A & H Sportswear, Inc. v. Victoria's*
    *Secret Stores, Inc.*, 237 F.3d 198 (3d Cir.
    2000) . . . . . . . . . . . . . . . . . . . . . .21

*A.J. Canfield Co. v. Honickman* 808 F.2d 291
    (3rd Cir. 1986) . . . . . . . . . . . . . . . . . 21

*AMF Inc. v. Jewett*, 711 F.2d 1096 (D. Mass.
    1983) . . . . . . . . . . . . . . . . . . . . . . 27

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . 10

*Apple Corps. Ltd. v. Button Master, P.C.P.*,
    *Inc.*, 1998 WL 126935 (E.D. Pa. 1998) . . . . . . 22

*Arrow Fastener Co., Inc. v. Stanley Works*,
    59 F.3d 384 (2nd Cir. 1995) . . . . . . . . . . . 27

*AT&T Co. v. Winback and Conserve Program*,
    *Inc.*, 43 F.3rd 1421 (3rd Cir. 1994) . . . . . . . 28

*Banjo Buddies, Inc. v. Renosky* 399 F.3d 168 (3rd Cir.
    2005) . . . . . . . . . . . . . . . . . . . . . . 39

*Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358
    (3d Cir.1992) . . . . . . . . . . . . . . . . . .11

*Bijur Lubricating Corp. v. Devco Corp.*, 332
    F.Supp.2d 722 (D.N.J. 2004) . . . . . . . . . . 12

*Conopco, Inc. v. May Dept. Stores Co.*, 784 F.Supp. 648
    (E.D. Mo.), *rev'd on other grounds*, 46 F.3d
    1556 (Fed. Cir. 1994) . . . . . . . . . . . 35, 36

*Charles of the Ritz v. Quality King*, 664 F.Supp. 152
    (S.D.N.Y.), *aff'd*, 832 F.2d 1317 (2d Cir.
    1987) . . . . . . . . . . . . . . . . . . . . . 36

*Charles of the Ritz v. Quality King*, 636 F.Supp. 433
    (S.D.N.Y. 1986) . . . . . . . . . . . . . . . . 36

*Commerce Bancorp, Inc. v. BankAtlantic*, 285 F. Supp.2d
    475 (D.N.J. 2003) . . . . . . . . . . . . . . . 13

*Commerce Nat. Ins. Services, Inc. v. CommerceCommerce
    Nat. Ins. Services, Inc. v. Commerce Ins. Agency,
    Inc.*, 214 F.3d 432, 438 (3rd Cir. 2000) . . . . . 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . 11

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
    30 F.3d 466 (3d Cir. 1994) . . . . . . . . 12, 21

*Google Inc. v. American Blind & Wallpaper Factory
    Inc.*, 2005 WL 832398 (N.D. Cal. 2005) . . 15, 32, 33

*Government Employees Ins. Co. v Google, Inc.*, 330 F.
    Supp.2d 700 (E.D. Va. 2004) . . . . . . 15, 31, 32

*Harlem Wizards Entertainment Basketball, Inc.
    v. NBA Properties, Inc.*, 952 F. Supp. 1084
    (D.N.J. 1997) . . . . . . . . . . . . . . .12, 16

*Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209
    (3d Cir. 1988) . . . . . . . . . . . . . . . 10

*Home Box Office, Inc. v. Showtime/The Movie Channel,
    Inc.*, 832 F.2d 1311 (2d Cir.1987) . . . . . . . 36

*Hyman v. Nationwide Mut. Fire Ins. Co.*,
    304 F.3d 1179 (11th Cir. 2002) . . . . . . . . 27

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star,
    Inc.*, 846 F.2d 1079 (7th Cir.1988) . . . . . . 36

*interState Net Bank v. NetB@nk, Inc.*,
    348 F.Supp.2d 340, 3562 (D.N.J. 2004) . . . . . 29

*Investacorp, Inc. v. Arabian Inv. Banking Corp.
    (Investcorp) E.C.*, 722 F.Supp. 719 (S.D.Fla.
    1989) . . . . . . . . . . . . . . . . . . . 14

*J & J Snack Foods*, 220 F.Supp.2d 358 (D.N.J.
    2002) . . . . . . . . . . . . . . 12, 13, 21

*Jews for Jesus v. Brodsky*, 993 F. Supp. 282
    (D.N.J.), aff'd, 159 F. 3d 1351
    (3d Cir. 1998) . . . . . . . . . . . 28, 34, 35

*Leejay v. Bed, Bath & Beyond, Inc.*, 942 F. Supp.
      699 (D. Mass. 1996) . . . . . . . . . . . . . .  13

*Matsushita Elec. Indus. Co. v. Zenith Radio
      Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . 11

*Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362
      (D.N.J. 2004) . . . . . . . . . . . . . . . . 16, 17

*P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F. Supp.
      662 (S.D.N.Y. 1985) . . . . . . . . . . . . . . 14

*Premier Dental Products Co. v. Darby Dental
      Supply Co.*, 794 F.2d 850 (3rd Cir. 1986) . . . . 26

*Puritan Sportswear Corp. v. Shure*, 307 F.Supp.
      377 (W.D. Pa. 1969) . . . . . . . . . . . . . . 37

*T.N. Dickinson Co. v. LL Corp.*, 985 WL 14175,
      227 U.S.P.Q. 145 (D. Conn. 1985) . . . . . . 37, 38

*Travelodge Hotels, Inc. v. Elkins Motel
      Associates, Inc.*, Slip Copy, 2005 WL 2656676
      (D.N.J., Oct 18, 2005) . . . . . . . . . . . . . 39

*Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d
      1562 (11th Cir.1987) . . . . . . . . . . . . . . 39

Statutes

15 U.S.C. § 1115(a) . . . . . . . . . . . .20, 27, 28, 29

15 U.S.C. § 1117(a) . . . . . . . . . . . . . . . . 38

15 U.S.C. 15 U.S.C. § 1125 . . . . . . . . . . . . . 12

15 U.S.C. § 1127 . . . . . . . . . . . . . . . . . 26

N.J.S.A. 56:4-1 . . . . . . . . . . . . . . . . 16, 29

Other Sources

1 J.T. McCarthy *Trademarks and Unfair
Competition* §§ 2.07-.09 (3d Ed. 1995 rev.) . . . . . . 10

R. Callman, <u>Unfair Competition, Trademarks and Monopolies</u>, §2.32 (4th Ed. 1981) . . . . . . . . . 38

**PRELIMINARY STATEMENT**

This Complaint here was filed against a young, phenomenally successful on-line business in California, Humble Abode, which sells quality bedroom furniture on line.  The plaintiff[1] is a frustrated competitor, Steve Ross.  His business strategy:  Use Humble Abode's popular online trademarks and reputation to drive business to his own competitive website.  When Humble Abode realized what Ross was doing, Ross was confronted; he lashed out by filing this plainly meritless suit, hoping to use this Court to achieve what he could not achieve in the market.

Ross's trope since the filing of Humble Abode's counterclaims has been to characterize this as a mere business dispute, a "tit for tat" spat among roughly equal competitors. He has claimed that his website engages merely in "comparative advertising."  The law, however, is clear that this is not comparative advertising.  Consumer confusion is so likely because of the plaintiff's misleading use of Humble Abode's trademarks that the website is merely garden variety trademark infringement and unfair competition, 21st-century-style.

Yet it was plaintiff that brought this lawsuit, claiming rights in a purported trademark that his own attorney told him not to try to register, and that he had to know defendant had

---

[1] For simplicity, the plaintiff and all counterclaim and third-party defendants still in this case will be referred to as "plaintiff," and all three defendants will be referred to collectively as "defendant."

1

neither infringed nor even heard of before he began his own brand-hijacking campaign.    Plaintiff's lawsuit is a classic abuse of the law and of this Court, and one that this Court should end, now, by granting a summary judgment to Humble Abode on both plaintiff's claims, and by considering the counterclaims of defendant with a fresh eye and on their own merits, for they, too, should be resolved in Humble Abode's favor on this motion.

### STATEMENT OF FACTS

Humble Abode, LLC ("Humble Abode), based in San Francisco, sells high-end furniture through its website, HumbleAbode.com (see Exhibit A to the Answer[2]).    The website, and hence the company, have been profitable since their second month of operation. Humble Abode achieved its high degree of initial success by virtue, in part, of its unique marketing strategy and the investment of nearly $1 million in developing its website and in hundreds of thousands of dollars in Internet-based advertising. HA was awarded a trademark registration for the HUMBLE ABODE trademark on January 27, 2004.    Exh. F. to the Certification of Ronald D. Coleman, Esq. ("Coleman Cert.").

---

[2] For economy of resources and to prevent excessive duplication, each of the exhibits to the Answer and Counterclaims, etc. of Humble Abode has been incorporated by reference and authenticated by the Coleman Wickersham Certification. The Wickersham Certification also authenticates, as based on the affiant's first-hand knowledge, all the factual allegations of that pleading (effectively rendering it a verified complaint.)   Unless otherwise indicated herein, all factual references or exhibits are references to the Answer as so verified pursuant to Fed. R. Civ. P. 56.

In early 2002, Leggett & Platt ("L&P"), a leading supplier of bedroom furniture, approached Humble Abode to become its primary supplier of furniture. Bella Ross and her son, Daniel Ross, were to act as Humble Abode's account representative with L&P. Steve Ross is Daniel's other brother, but he is not part of this independent sales representative business, which is known as Ross Enterprises.

In February of 2003, Bella and Daniel Ross visited San Francisco and took James Wickersham out to dinner. At the San Francisco dinner, Bella and Dan Ross questioned James about Humble Abode's marketing techniques, business practices, and about the direction of the business generally. James answered their questions, assuming confidentiality. There is no direct evidence that Bella and Dan Ross told anyone, including Steve Ross, what they had learned from their customer Humble Abode about its business.

Not long after the San Francisco dinner, however, Humble Abode began experiencing direct competitive attacks targeted at its trademarks and its business from websites located at www.BuyingfortheHome.com, www.DirectlyHome.com and www.Buying-Furniture.com and related domain names. These websites had as their main topics not so much the sale of furniture as the disparagement of Humble Abode. Humble Abode learned that in early 2003, a Google search for the words "Humble Abode furniture" resulted in the outcome demonstrated in a screen shot

3

typified by the April, 2003 exemplar that is Exhibit B to the Answer:    The  top  three  results  understandably  returned HumbleAbode.com for the search term, "Humble Abode furniture." But  the  next  *four*  hits  returned  the  apparently  unrelated BuyingFurniture.com and a cognate or mirror site (also owned by Steve  Ross  or  a  Ross  company),  BuyingFurniture.biz. Astonishingly, the only sponsored link that appeared in the April 12, 2003 Google search for the search term "Humble Abode furniture" was – as indicated on the right of the screen shot in Exhibit B – an advertisement for Steve Ross's TotalBedroom.com. The advertisement read, "Find many of *the HumbleAbode.com beds* at a significant discount" (emphasis added).

In short, the main Steve Ross website – TotalBedroom.com – used the HUMBLE ABODE trademark to drive customers to his own websites via Google advertising, claiming falsely that they could buy "the Humble Abode beds" from him. He used the term not only in its advertising, but unambiguously in "trademark use" – describing the products it sells not even as "the same beds sold by HumbleAbode.com," which would also be misleading, but "the HumbleAbode.com" beds, using the eye-catching headline, "SAVE ON **HUMBLE ABODE**."

A closer look at Steve Ross's websites revealed even more distressing news. Not only were Ross's websites targeting Internet customers by using Humble Abode's name to get their attention, then promising to sell "the HumbleAbode.com beds"

4

through another website. TotalBedroom.com also expressly
offered consumers the opportunity to search through its website
for Humble Abode furniture products by using Humble Abode's
unique product names (the "HA Furniture Marks", a complete list
of which is set out in the margin below[3]) through its "Site
Index" – an online, searchable listing of the arbitrary names
used to describe Humble Abode's individual products, coined by
Humble Abode or merely by searching the TotalBedroom.com website
for the term "Humble Abode." Wickersham Cert. Exh. ___.

In March of 2003, James Wickersham twice called the office
of Directly Home, Inc., Steven Ross's company, to protest the
use of the Humble Abode marks on Ross's websites. After the
second call, Ross called Mr. Wickersham back and threatened that
if anyone from Humble Abode called again Directly Home would
immediately sue them. But Directly Home never did, Instead, in

---

[3] The HA Furniture Marks actually utilized on
TotalBedroom.com were: ACCOLADE, ALABASTER, APEX, APPALOOSA,
ASHLAND, ASTAIRE, ATLANTA, BACALL, BEETHOVEN, BENNETT, BENSON,
BERKSHIRE, BRIGHTON, BROWNSTONE, CAMBER, CAMPTOWN, CAROLYN,
CHALET WHITE, CHESTERFIELD, CLUBHOUSE II, COLORADO, CONCERTO
CANOPY, DISCOVERY II, DREAMER II, EMPIRE, ENCHANT, EVENING
GARDEN, FERDINAND, GOVERNOR, GRIZZLY, GWENEVERE, HANNAH,
HARTINGTON, HAVEN, HELENA, HEARTLAND, HOMESTYLE, HONDO, HUDSON,
IMPERIAL, IRENE, JASMINE, JASMINE CANOPY, JENNY, KELLINGTON,
KORINA, LAKEWOOD, LAYLA, LEANNE, LEONARDO, LORRIE, MADRID,
MANSFIELD, MAPLETON, MARIGOLD, MARLEE OPEN TOE, MARLOW, MARLOW
CANOPY, MELISSA, MIRAGE, MONTANA, MONTANA LANEY, MONTEGO,
MONTGOMERY, MOROCCO, NORTHROP, PARK AVENUE BRASS, PARK AVENUE
PLATINUM, PINECREST, PINEHAVEN, POLO SARATOGA, PROVIDENCE,
REFLEX, REGAL, ROSEMARY, SAMANTHA, SANDUSKY, SENTINEL, SEQUOIA,
SONATA, STANFORD, SUMMERHILL, SUNDAE, SAMARIND, TIARA,
TRANQUILITY, VERANNA, VICTORIA II, WESTINGTON, and YUKON.
Wickersham Cert. at ___.

May, plaintiff Buying for the Home ("BFH") filed for incorporation, evidently for purposes of this litigation, providing the Division of Revenue with an annonymous "Mailboxes, Etc." address for his Ross's new company.

Approximately three weeks later, the Complaint in this action was filed by BFH, Steve Ross's Mailboxes, Etc.-based company. Ironically, the complaint was fundamentally based on trademark infringement, defamation and trade disparagement – the precise behavior directed by Ross and his websites against Humble Abode.

Plaintiff's complaint of "infringement" of the non-trademark TOTAL BEDROOM is based on the allegation that Humble Abode "has caused its own sponsorship ad for its website to appear on the screen right next to [TotalBedroom.com]'s listing anytime [sic] a person searching the Internet types the search phrase "total bedroom." Even if TOTAL BEDROOM could be a trademark; even if it could be plaintiff's trademark; even if the alleged act amounted to trademark infringement; even if plaintiff could possibly prove *any* secondary meaning – there is no proof that Humble Abode ever purchased "Total Bedroom" as a search term, nor that Humble Abode "has caused its own sponsorship ad for its website to appear on the screen right next to [TotalBedroom.com]'s listing anytime [*sic*] a person searching the Internet types the search phrase "total bedroom." In fact, an email from Google, in response to an inquiry by

James Wickersham after he was accused of doing by Steve Ross but before Humble Abode was served with the Complaint, disproves plaintiff's central claim dispositively:

> From: AdWords Support [adwords-support@google.com]
> Sent: Friday, June 20, 2003 10:10 AM
> To: jwickersham@humbleabode.com
> Subject: [#2674051] Google AdWords account
>
> Hello James,
>
> Thank you for your call today.
>
> Google AdWords keeps record of all ad text and keywords used in an account regardless of the status of your account. This means you can view all ad text and keywords you have ever used in your account regardless if they have been disapproved, deleted, or edited.
>
> If the ad text or keywords have been deleted, they may be hidden from your view. To view these items, simply click the 'Show everything I have Deleted' button at the top of the campaign management page. Your page will reload and will include all information for the account. To ensure all data is included, please make sure the date range at the top of the page is set to show 'all time.'
>
> As per our conversation, there is no way to remove data from an account. We keep all data in the account to ensure all statistics can be viewed at any time.
>
> I have reviewed your entire account and do not have record of you currently using the term 'Total Bedroom,' nor have you used this term in the past.
>
> It is possible that your ad may have appeared on a search for 'Total Bedroom' as you do have the term 'bedroom' listed in your HA.com campaign in ad group #70. This term is listed as a broad match. This means your ad will show for any search containing the term 'bedroom.'
>
> Using this term does not violate trademark policies in our system. We believe it is appropriate for these ads to be triggered if the non-trademarked term 'bedroom'

is entered as part of a search query.  Accordingly, we will take no action to remove the ad.

We do, review the content of ads to ensure that they do not mislead others into believing they correspond to the trademark owner's company. After all, it is not our intention to display misleading ads. In this particular case, we have not found that to be an issue. Your ads clearly state your company name in the title line and URL of your ad. I have included a copy of the ad text below.

Humble Abode Bedrooms
Iron Beds, Daybeds Bed Frames
Quality-Comfort-Style - Headboards
www.humbleabode.com

Please feel free to contact me directly at 650-623-4419, or by emailing me at frankie.d@google.com you have additional questions or concerns.

I look forward to providing you with the most effective advertising available.

Sincerely,

Frankie and
The Google AdWords Team

Wickersham Exh. 1.  Indeed, a printout of a Google search produced by plaintiff using the term "TOTAL BEDROOM" showed ten results on the first page (only the first page is produced) and four sponsored links on the right.  Just as in Exhibit B from April, 2003, *not one of the links from plaintiff's March 1, 2004 search is a link to Humble Abode*.  What the first page does look like is shown as Exhibit C to the Answer.

Notwithstanding the foregoing, in an attempt to support its claim plaintiff produced in discovery a printout of a single Google search that appears to be the closest thing to a search

made contemporaneously with the filing of the Complaint, although it bears no dates. Exhibit A to the Coleman Cert. shows a single instance of a search for "total bedroom" evidently returning a sponsored ad for Humble Abode. A companion printout for the word "BEDROOM" does not bring up the ad. Plaintiff has argued that this proves that Google lied to James Wickersham – that in fact Humble Abode bought a sponsored ad using the term "TOTAL BEDROOM." That one search result, claims plaintiff, is why this case has been occupying this District Court for three years.

In fact, this result proves nothing of the sort. Humble Abode, of course, advertised on Google using the keyword "BEDROOM," which can also include any other word in the search as long as "BEDROOM" is included. That does not, however, mean that Humble Abode's ad linked to "BEDROOM" will appear 100% of the time the term is searched. A simple understanding of sponsored ad words explains why: As Google puts it, "Your daily budget determines how often your ad is shown for your keywords." Found at, https://adwords.google.com/select/tips.html. It would be prohibitively expensive to pay for the Humble Abode ad to come up at each and every search for the word "bedroom," so sometimes it does, and sometimes it does not.

Finally, plaintiff has the burden, in proving the existence of a common law mark, much less a descriptive one (see below) such as TOTAL BEDROOM, of demonstrating good will. Trademark

good will is "The value of a business or a line of goods and services that reflects commercial reputation." 1 J.T. McCarthy *Trademarks and Unfair Competition* §§ 2.07-.09 (3d Ed. 1995 rev.) Plaintiff has produced virtually nothing to prove good will, however. Indeed, the domain name TotalBedroom.com was not registered for the first time until mid-November of 2002, although plaintiff's interrogatory responses claim the term has been in use since 1999. Coleman Exh. B.

Finally, there are claims in the Complaint for defamation and trade disparagement. As set forth below, plaintiff cannot possibly meet the high standard of proof, much less even enunciate cognizable damages, in connection with these claims.

**LEGAL ARGUMENT**

### I. PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED

#### a. Summary judgment standard

Summary judgment is granted under FRCP 56(c) if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d

10

1209, 1219 n. 3 (3d Cir. 1988).

Therefore, on a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. The non-moving party must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir.1992).

**b. Plaintiff's trademark claim should be dismissed**

Section 43(a) prohibits the false designation of the origin of goods or services:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, ··· shall be liable in a civil action by any person who believes that he or she is or is likely to

11

be damaged by such act.
15 U.S.C. § 1125(a)(1)(A).

"The law governing trademark infringement under section 43(a) of the Lanham Act, which protects unregistered trademarks, generally follows the law governing infringement of registered trademarks, which are protected under section 32." *Bijur Lubricating Corp. v. Devco Corp.,* 332 F.Supp.2d 722, 726-27 (D.N.J. 2004). As for the state law claims, "N.J.S.A. 56:4-1 is the statutory equivalent of Section 43(a)(1) of the Lanham Act and the analysis for trademark infringement under New Jersey common law is the same as under Section 43(a)(1)." *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc.,* 952 F. Supp. 1084, 1091 (D.N.J. 1997).

**1) TOTAL BEDROOM is a descriptive mark**

To maintain a trademark action there must be a valid trademark. The enforceability of any mark (other than an incontestable registered mark) depends on proof of secondary meaning, unless the mark is inherently distinctive. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir. 1994).

The distinctiveness and protectability of any trademark is determined by considering the classification of the mark, which may fall into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *J & J Snack Foods,* 220 F.Supp.2d 358, 375 (D.N.J. 2002). The more distinctive a

word, term or design is, the more likely it is to be granted the status of a trademark. A descriptive trademark is one that directly gives some reasonably accurate or tolerably distinct knowledge of the characteristics of a product. *Id.* For example, BED & BATH was found to be descriptive for a store that sells items for the bedroom and bathroom in *Leejay v. Bed, Bath & Beyond, Inc.*, 942 F. Supp. 699 (D. Mass. 1996). TOTAL BEDROOM describes what plaintiff sells, just as the BED & BATH describes that the store using that mark sells. A descriptive mark such as TOTAL BEDROOM is not entitled to trademark protection unless plaintiff can prove it has secondary meaning.

### 2) **TOTAL BEDROOM has no secondary meaning**

Secondary meaning exists when a trademark is interpreted by the consuming public as not only an identification of the product or services, but also a representation of the origin of those products or services. *Commerce Bancorp, Inc. v. BankAtlantic*, 285 F. Supp.2d 475, 485 (D.N.J. 2003). The burden of proving secondary meaning is on the proponent of the mark. The Third Circuit has provided a non-exclusive list of factors that may be considered in the analysis for secondary meaning includes (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of

customers; and (11) actual confusion. *Commerce Nat. Ins. Services, Inc. v. CommerceCommerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3rd Cir. 2000).

Regarding TOTAL BEDROOM, there is no direct evidence of secondary meaning that TOTAL BEDROOM is a trademark: no proof of consumer testimony in the record of this case; no surveys. As to circumstantial evidence, there is some proof of on-line sales from <u>TotalBedroom.com</u>, the only website that used the TOTAL BEDROOM name, contained in the Declaration of Linda Isley, a Custodian of Records for Yahoo!, Inc. ("Yahoo!"), filed herewith (under seal pursuant to the confidentiality order in this case). The Isley Declaration shows that for the single 365-day period shown in Yahoo!'s analysis of the <u>TotalBedroom.com</u> website (which operates on the Yahoo! Internet retail platform), the company had approximately $1.5 million in sales, about one-fifth of which was made of non-Internet sales (i.e., for models sold through the Yahoo! System but showing no Internet "page views" by consumers who would have had to generate page views to order through the system). Mere existence of sales by a business is not, however, proof of secondary meaning of a trademark. *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 722 F.Supp. 719, 724 (S.D.Fla. 1989); *P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F. Supp. 662, 673 (S.D.N.Y. 1985). Plaintiff has produced no proof of extensive advertising expenditures for TOTAL BEDROOM. Additionally, the fact that the

website was in operation only a few months when the Complaint was filed suggests that there can be no factual basis on which to proceed to trial on the question of whether plaintiff will establish secondary meaning in the term TOTAL BEDROOM. It cannot possibly help plaintiff that, at his deposition, he had no idea – even in terms of the order of magnitude – of the number "unique visits" to his websites.  Ross 79-80.

### 3) Plaintiff's claim of infringement by search engine is not supported by any facts in the record

There is little support for plaintiff's assertion that it owns a trademark.  But there is also no evidence of infringement, much less the search-engine-based infringement claimed in the Complaint, of any trademark by defendant.

A party's use of another's trademark as a search term in an Internet engine may, in appropriate circumstances, give rise to liability for trademark infringement arising out of those advertisements, although the law is still unsettled on this question. See *Government Employees Ins. Co. v Google, Inc.*, 330 F.Supp.2d 700, 704-705 (E.D. Va. 2004) ("GEICO"); *Google Inc. v. American Blind & Wallpaper Factory Inc.*, 2005 WL 832398 (N.D. Cal. 2005).  These issues are discussed in greater depth below in connection with defendant's legal argument regarding its counterclaims.  Here, however, there is simply no proof that defendants ever actually purchased plaintiff's essentially unknown, unprotectible business name as a search term.  On the other hand, there is proof – the letter from Google set forth

15

above – that directly contradicts that assertion.

**c. Plaintiff's state law unfair competition claims should be dismissed**

The complaint includes a claim under N.J.S.A. 56:4-1, which

provides as follows:

> No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals.

Because as set forth above plaintiff cannot possibly make

out a claim under the Lanham Act, its state law claim must fail

as well. *See*, *Harlem Wizards*, *supra*, 952 F. Supp. at 1091.

**d. Plaintiff's defamation and trade disparagement claims should be dismissed**

The record contains no proof of actionable defamation or

trade disparagement of plaintiffs by any defendant, and these

causes of action should also be dismissed. To prevail on a

defamation claim, a plaintiff must prove, by a preponderance of

the evidence: (1) that the defendant made a defamatory statement

of fact; (2) concerning the plaintiff; (3) which was false; (4)

which was communicated to persons other than the plaintiff; and

(5) fault. *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d

362, 372 (D.N.J. 2004). Furthermore,

> A defamation action generally requires that plaintiff demonstrate damages in the form of actual harm to reputation through the production of concrete proof. As such, awards based on plaintiff's testimony alone or the inference of damages are unacceptable.

*Id.* at 377 (internal quotes and citations omitted). Regarding

trade libel, the claim of which here is based on the same

allegedly false and damaging statements by James Wickersham:

> The elements of trade libel are: 1) publication; 2) with malice; 3) of false allegations concerning its property, product or business, and 4) special damages, i.e. pecuniary harm. A [trade] disparagement plaintiff must show the publication of matter derogatory to plaintiff's business in general of a kind calculated to prevent others from dealing with plaintiff or otherwise to disadvantageously interfere with plaintiff's relations with others.

*Id.* at 378 (internal quotes and citations omitted). None of these elements proved by plaintiff here under the standard for resisting a motion for summary judgment. Even if they could be, plaintiff's trade disparagement claim must fail because he has not met the heightened pleading standard requiring that a trade disparagement plaintiff both plead and prove special damages with particularity, *id.* Such a claim must

> allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication. Moreover, if predicating its claim on a general diminution in business, plaintiff "should have alleged facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales for a [period] subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.

*Id.* at 378-379 (internal quotes and citations omitted). Both the pleadings and the record in discovery fall far short of this demanding standard, meant to clear from the dockets meritless and reckless claims of trade disparagement such as those here.

Indeed, the testimony of Steve Ross demonstrates that

neither claim is even coherent.   In his deposition, Ross

admitted that the only "damage" suffered by his company as a

result of comments made by defendants Wickersham and Humble

Abode was that his privileged pricing status, based on L&P's

previous "mistaken" belief that Steve Ross was part of his

mother Bella's business, was reevaluated by L&P after it heard

from Mr. Wickersham.   Admitted Ross (emphasis added):

> A [Ross]:   Leggett extended credit terms and decided
> to do business with us as an independent organization,
> not as a division or whatever of Bella or Ross
> Industries, *which would make sense*, since we never
> were a division or whatever of Bella or Ross
> Industries.

Ross at 31 (emphasis added).   Besides admitting that the

reevaluation was appropriate, Ross admits that he has no idea

what the cost of this supposed defamation was to this company:

> Q:   How substantial was the increase?
>
> A:   Significant enough for us to seek a lawsuit.
>
> Q:   Right.   But see this is the lawsuit and now you
> have to tell us what the difference – what that
> quantum is in order for a jury to make a decision
> about whether you get damages.   So was it –
>
> A:   I would be guessing.   Do you want me to guess?
>
> Q:   Can you estimate instead of guessing?
>
> A:   An estimate would be zero to 30 percent, depending
> on the product. . . .
>
> Q:   Has [BFH] been damaged in its reputation among
> product vendors by virtue of the statements made by
> Humble Abode?
>
> A:   Yes. . . .

Q:  Has that damage cost any money?

A:   Well, in addition to the Fashion Bed Group situation, other vendors that they contacted evaluated our pricing and increased it. . . .

Q:  So what is the basis of your belief that the false statements caused the change of the pricing?

A:   It's been made clear to me by an executive at [L&P] who – it's been made clear to me. . . .

Q:  Who told you that?

A:   I don't know his name.  But I heard it several places, actually. . . .

Q:  Do you have reason to believe that [L&P] did not believe your side of the story, and that they remained with the false impression created by Wickersham's statements?

A:   I believe they didn't care about the truth.  They cared about the perception.

*Id*. at. 32-38. No more information than this hearsay is found anywhere in the record. Plaintiff has put forward no information in discovery that is any more detailed as to its "zero to thirty percent" range of price increases, including what the actual dollar loss to plaintiff was from the increase.  Plaintiff even admits that the increase "made sense" – i.e., cleared up what could charitably be called a "misunderstanding" the supplier had about his affiliation with his mother's company.  He admits, in fact, that a change in pricing that had its genesis in comments made about "copyrights" by James Wickersham (see below) somehow managed to affect many others in his position –

A:   I was led to believe I was not the only one that

19

had this pricing increase.  But I am not certain. *id*. at 32 – without a coherent explanation as to how Mr. Wickersham could have had this effect.

And what were the "false" and "disparaging" statements made by Mr. Wickersham?  "Mr. Wickersham accused us of violating his copyrights." Id. at 34.   There is no corroborating evidence of this claim; in any event, what Mr. Wickersham may have said, as demonstrated below, about Steve Ross's business practices actually turn out to be quite true – and hence not actionable.

## II.  THE COURT SHOULD AWARD DEFENDANT SUMMARY JUDGMENT ON THE REMAINING COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Humble Abode owns certain trademarks, namely the registered HUMBLE ABODE mark (U.S. Patent and Trademark Registration Number 76515455), a copy of which is attached as Exhibit A to the Coleman Certification, and the various original product names used by the Humble Abode website to sell merchandise on the Internet, which are common law trademarks.   Although these product names are not registered, plaintiffs have, on their own websites, admitted explicitly that these product names are trademarks of Humble Abode and have gone on to use them as trademarks, i.e., to sell its own products under the Humble Abode designations.

### a. The HUMBLE ABODE registered trademark is enforceable

Federal registration of a trademark is prima facie evidence of a mark's validity. 15 U.S.C. § 1115(a). HUMBLE ABODE is a registered mark and is therefore entitled to that presumption.

20

The enforceability of any mark (other than an incontestable registered mark) depends on proof of secondary meaning, unless, as here, the registered mark is inherently distinctive. *Fisons Horticulture, supra,* 30 F.3d at 472.

   1) **HUMBLE ABODE is inherently distinctive**

   The distinctiveness and protectability of any trademark is determined by considering the classification of the mark, which may fall into four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *J & J Snack Foods, supra*, 220 F. Supp. 2d at 375. The more distinctive a word, term or design is, the more likely it is to be granted the status of a trademark.

   HUMBLE ABODE is a suggestive mark. A suggestive mark "suggest[s] rather than describe[s] the characteristics of the goods." *A.J. Canfield Co. v. Honickman* 808 F.2d 291, 296 (3rd Cir. 1986). It requires consumer "imagination, thought, or perception" to determine what the product is. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 222 (3d Cir.2000). Here the concept of domesticity is alluded to by HUMBLE ABODE, which is used in connection with the sale of goods for use in the home, but there is no information conveyed about what it is in "a humble abode" that HUMBLE ABODE sells. It could be housewares; real estate; interior design; marriage counseling. A suggestive mark is inherently distinctive, *J & J Snack Foods*, F.Supp.2d at 365, and therefore no proof of

21

secondary meaning need be adduced, *see id*.

### 2) **HUMBLE ABODE has secondary meaning**

In any case, secondary meaning can readily be demonstrated here.  As set forth above, this Circuit employs a non-exclusive list of factors which may be considered in the analysis for secondary meaning.   These factors are considered seriatim as they apply to HUMBLE ABODE:

### (i)    **The extent of sales and advertising leading to buyer association**

The HUMBLE ABODE trademark has been supported by $670,098.62 in advertising investment which has, in part, resulted in sales of $3,950,336.55, over the years 2002-2005.   All these expenditures promote the business name of Humble Abode, which of course is the trademark HUMBLE ABODE, thus directly connecting the trademark with the source of the goods and services provided by defendant.

### (ii)   **Length of use**

The HUMBLE ABODE trademark has been in steady use since 2002.

### (iii)  **Copying by the infringer**

"The 'fact of copying' is an important factor in the secondary meaning analysis." *Apple Corps. Ltd. v. Button Master, P.C.P., Inc.*, 1998 WL 126935 (E.D. Pa. 1998) at *10, n.11.  The HUMBLE ABODE trademark had already been in use for over a year, and its registration pending, by the time plaintiff began utilizing it – not a variant of it but the exact mark – in its various website operations.

### (iv)   Customer surveys / testimony / trade journals

HUMBLE ABODE has not commissioned any customer surveys and has no customer testimony to submit. Defendant is not aware of any use of the mark in trade journals.

### (v)   Size of the company / revenue / sales

HUMBLE ABODE has five full time employees.  As stated above, its revenue over the last three years has averaged over a million dollars per year, a substantial success for a Web-based business that is in its first years of operation.

Application of these standards suggests that HUMBLE ABODE has achieved secondary meaning.

### b. The HA Furniture Marks are enforceable as trademarks

Plaintiff also violated defendant's common law trademarks, the unique, proprietary and arbitrary product names by which it sells its furniture, by his use of the names of these beds on his website – in an index, as a search term, and on virtually every page where he interacted with consumers, to sell his own merchandise.

The business model of TotalBedroom.com and the affiliated websites was to mislead customers into believing they were buying the "same beds" sold by Humble Abode by using Humble Abode's common law product designations.  At certain junctures on its website, the Totalbedroom.com states, in grey text:

**Humble Abode and product names are trademarks of
HumbleAbode.com, LLC**

23

(the "Trademark Acknowledgment").[4]

While the vast majority of the text on the <u>TotalBedroom.com</u> site was black, The Trademark Acknowledgment was in light gray. As the user scrolled down through the Price Comparison page, however, <u>TotalBedroom.com</u> used the HA Furniture Marks without repeating the Trademark Acknowledgment or otherwise acknowledging Humble Abode's trademark rights in the product names utilized. As a result, users who scrolled past the Trademark Acknowledgment at the top of the page quickly encountered screen after screen of product images using the HA Furniture Marks without any further acknowledgment of Humble Abode's trademark rights in the product names utilized to sell merchandise at <u>TotalBedroom.com</u>. See Exhibit B to the Answer.

### 1. Plaintiff has admitted that the HA Furniture Marks are trademarks

The Trademark Acknowledgment is, of course, an acknowledgment by plaintiff – drafted with the careful assistance of skilled counsel – that, in its words, "Humble Abode and product names are trademarks of HumbleAbode.com, LLC." Ross at 55. This is not a situation where some legal, technical pleading misstep or discovery hiccup is being proffered as a "gotcha" basis to prejudice one side in litigation. Here the party has himself admitted, in what was clearly meant to shape

---

[4] HumbleAbode.com, LLC is the original name of Humble Abode and the name it utilized on its credit application with L&P, which was submitted to Daniel A. and Bella D. Ross. Obviously this is where defendant Steve Ross got this company name.

legal liability (i.e., by supposedly "disclaiming" an intent to infringe on trademarks; but see below), that the Humble Abode product names (and the HUMBLE ABODE trademark) are, in fact, trademarks of Humble Abode.  This Court should require plaintiff to live with its own assertion and treat the HA Furniture Marks as the trademarks that plaintiff asserts they are.

### 2. The HA Furniture Marks are enforceable as "dealer marks"

Plaintiff's assertion regarding the HA Furniture Marks was, in fact, based on good law.  In this litigation, however, plaintiff has claimed, both on his website and in representations to the Court, that there can be no infringement here because the beds being purchased by consumers, whether from Humble Abode or plaintiff, were "the same beds" – both being manufactured by L&P; and that all plaintiff has been doing is offering a better price to consumers who want to comparison shop.  This argument is based on a mistaken understanding of trademark law, however.  Because plaintiff is actually *using the HA Furniture Marks to advertise and sell* its own beds, this constitutes trademark infringement even if they come from the same source.  In short, these are not "the same beds," because under the Lanham Act only Humble Abode or its authorized licensee can sell "a Humble Abode bed."

The protectibility of trademarks used by distributors or resellers – also known as "dealer marks" – is not an open question, and was definitively decided in this Circuit in

25

*Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 854 (3rd Cir. 1986). As the Circuit Court explained:

> It is well established that a distributor may own the trademark in goods it does not manufacture.[5] As Professor Callmann has written,
>
> > The use of a trademark does not necessarily and as a matter of law import that the articles upon which it is used are manufactured by its user. It may be enough that they are manufactured for him, that he controls their production, or *even that they pass through his hands in the course of trade, and that he gives to them the benefit of his reputation, or of his name and business style*. The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it.
>
> --------------------
>
> [5] 15 U.S.C. § 1127 defines a trademark as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer **or merchant** to identify his goods and distinguish them from those sold by others" (emphasis added).

(Italic emphasis added.) What matters regarding the HA Furniture Marks, as in the case of any product that may ultimately be a commodity but which is branded and marketed by individual dealers, is that the public associates the seller with the goods. Plaintiff's own website, search-term strategy and advertising demonstrate that this is indeed the case regarding the HA Furniture Marks, as detailed below.

### 3. Catalog designations such as the HA Furniture Marks are protectible as trademarks

The HA Furniture Marks are, of course, model designations utilized in its online store, which is essentially an interactive catalog which consumers can browse and ultimately

make their purchases.  Just as "dealer marks" are protectible as trademarks, unique catalog designations such as model numbers and catalog designations will also be protected as trademarks when they are recognized as such by consumers or the trade. See, *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1191 (11th Cir. 2002) (artwork and model numbers used in catalog that were confusingly similar to those used by plaintiff "plainly were designed to promote [infringer's] products by garnering attention to them in the catalogue"); *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 399 (2nd Cir. 1995) (model numbers of products entitled to protection from competitor's use involving products that the mark identifies and others that directly compete with it); *AMF Inc. v. Jewett*, 711 F.2d 1096, 1111-14 (D. Mass. 1983) (company substituting "generic" or other merchandise in orders to customers who ordered based on plaintiff's brand name merchandise caused consumer confusion).

Here the HA Furniture Marks function as merchant-specific model designations and, as plaintiff has shown by his use and indeed exploitation of them, they function that way for the public.  This is the classic definition of a trademark, and plaintiff used them that way in selling its own merchandise.

### c. Plaintiff is liable for false advertising and unfair competition under the Lanham Act

The foregoing behavior clearly makes out a violation of § 43(a) of the Lanham Act.  Its elements are (1) a false or

27

misleading statement, (2) actual or likely deception of potential customers, (3) material deception, (4) interstate commerce, and (5) injury or likelihood of injury. *AT&T Co. v. Winback and Conserve Program, Inc.*, 43 F.3rd 1421 (3rd Cir. 1994). This provision is traditionally used for federal enforcement of unregistered trademarks which, at the time this suit was filed and for a short period thereafter, HUMBLE ABODE was.  The HA Furniture Marks are, as demonstrated above, also unregistered trademarks.

The conduct of plaintiff set forth below falls squarely under § 43(a).  As set forth above, the entire enterprise of <u>Totalbedroom.com</u> and its affiliated websites amounted to false and misleading statements likely to confuse and deceive potential customers as to the source of the furniture they were purchasing, as well as to utilize the HUMBLE ABODE trademark and the HA Furniture Marks to improperly draw consumers to plaintiff's websites.  This Court has not hesitated to apply § 43(a) to such behavior, *see*, e.g., *Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J.), aff'd, 159 F. 3d 1351 (3d Cir. 1998), and should not hesitate to do so here.

### d. **<u>Plaintiff is liable for unfair competition under state law</u>**

Defendant has made an extensive argument above to demonstrate that the HA Furniture Marks are and should be treated as trademarks in this litigation, as plaintiff has acknowledged them to be.  It must be noted, however, that even

if they were not strictly enforceable as trademarks, the conduct of plaintiff set out above would still be actionable, and summary judgment appropriate on this record, under New Jersey's common law of unfair competition.  Although the *Harlem Wizards* decision and others have suggested, without discussion, that unfair competition under New Jersey common law and the N.J.S.A. 56:4-1 are both identical to the Lanham Act's § 43(a), this Court has recently taught that the common law protection afforded by New Jersey is greater than the Lanham Act's:

> [New Jersey] common law unfair competition . . . covers a broader spectrum of behavior than trademark or service mark infringement. In fact the common law of trademarks is but a part of the broader law of unfair competition. It is possible to be guilty of unfair competition even when trademark infringement is not present, if use of a similar but noninfringing mark or device is combined with unfair practices in a manner which is likely to deceive purchasers regarding the origin of goods under all the circumstances. In order to succeed on its state unfair competition claim, Defendant must show merely an (1) intent to deceive and (2) likelihood of deception or confusion.

*interState Net Bank v. NetB@nk, Inc.*, 348 F.Supp.2d 340, 3562-353 (D.N.J. 2004).  Doubtless plaintiff's scheme of unfair competition as detailed above meets the standard of an intent to deceive and the likelihood of consumer deception or confusion, and for that reason summary judgment on this basis is appropriate regarding the HA Furniture Marks and, *a fortiori*, the HUMBLE ABODE trademark.

In addition to getting access to non-Humble Abode products confusingly utilizing the HA Furniture Marks via the "Price

Comparison" page on TotalBedroom.com, users could also search the entire TotalBedroom.com website by using the Humble Abode Furniture Marks as search terms.  The search "result" lead the user to any number of the website's other pages, where the bed could be purchased from TotalBedroom.com.  For example, ACCOLADE IRON BED is one of the HA Furniture Marks.  A user who used as a search term the Humble Abode Furniture Mark ACCODLADE was led to the page on TotalBedroom.com website where it sells the "The Accolade Iron Bed." A printout of that display, and two other examples of the results of using HA Furniture Marks as search terms on the TotalBedroom.com website, are attached to the Complaint as Exhibit E.

Compounding this confusion, when the user reached the "checkout" page for the Humble Abode product, the HA Furniture Marks appeared yet again – without the Trademark Acknowledgment or informing the consumer that it was receiving "generic" furniture.  See Exhibit F.  The effect of the foregoing on the consumer was to give the impression that he could purchase a genuine Humble Abode product from TotalBedroom.com, which he could not.  Another of the affiliated websites (BuyingFurniture.com) explains:

> Here is the trick, look at the URL, http://www.humbleabode.com/bed_iron_secretgarden.htm – notice the URL identifies it as a Secret Garden. Then go to another site, like Directlyhome and search for Secret Garden. Low [sic] and behold the same bed . . .

(Emphasis added.)  This is not comparative advertising.  This is

30

a claim that the consumer can buy "the same bed" as that sold by Humble Abode, from another supplier – which it cannot. This is trademark infringement.

### 1. Plaintiff has engaged in search engine trademark infringement

Search engines, such as Google, enable consumers to search the Internet at great speed to locate websites offering products, services and information. Google generates income from this service in two main ways, both of which raise trademark issues: One is that it sells search terms or "keywords" to companies that wish their websites to be represented on a corresponding results list. A second is its sale of "Sponsored Links, which are advertisements that appear in the margin alongside the search results list. This second advertising practice is known as its "AdWords" program. Both the keywords and sponsored links may contain trademark-protected terms belonging to third parties.

Such were the facts in GEICO, *supra*, a case of first impression in which GEICO sued Google and Overture (an Internet marketing company) for using GEICO's trademarks to sell advertising. GEICO alleged, inter alia, that the defendants were contributorily liable for the paid advertisements which contained GEICO's marks in their text and were generated by customers who selected those terms when conducting a search. The court permitted the case to go forward on the question of contributory liability.

31

In a similar case, *Google Inc. v. American Blind & Wallpaper Factory Inc*., 2005 WL 832398 (N.D. Cal. 2005), Google sought a declaratory judgment that its "AdWords" advertising program, described above, did not infringe on the defendant's trademarks. American Blind's counterclaims for contributory trademark infringement centered on Google's "Adwords" program. Through this program, American Blind contended, Google had sold to American Blind's competitors, "keywords" that included in some form the American Blind trademarks, including AMERICAN BLIND, AMERICAN BLINDS, and AMERICANBLINDS.COM, which sales had proceeded over its objection. Id. at *2. Significantly for this case, Google responded by claiming that American Blind had failed to allege the requisite "use" of its marks, in this case by the defendant's advertisers *themselves*. See Id at *7. Specifically, Google contended that "because their advertisers are alleged to use the American Blind Marks only as a trigger for the display of their advertisements and not as an identification of the source of  their products, they [did] not engage in trademark 'use' of the American Blind Marks[.]" Such a failure to allege a direct infringement of its trademark rights, Google argued, defeated its contributory liability claim. Id.

The court disagreed, rejecting Google's motion to dismiss and allowing the contributory trademark infringement claim to go forward. Drawing on its earlier analysis regarding American Blind's claims of direct trademark infringement, see Id. at *4 –

*7, the court was not convinced, given the unsettled nature of the law, that the purchase of trademarks as keywords did not constitute trademark "use" by Google's advertisers. Id. at *7.

The record here shows that TotalBedroom.com caused its sponsored advertisement to appear alongside (at the right-hand margin) Humble Abode's entries when a user performed a Google search for the terms "HUMBLE ABODE FURNITURE."  As set out in the Answer, TotalBedroom.com also caused its sponsored advertisement to appear when a user performed a Google search for the HA Furniture Marks. Thus, for example, a search for "SAMANTHA BED" yields a sponsored advertisement for TotalBedroom.com.

Moreover, by use of the Yahoo! Internet search engine, an Internet user inputting the search term "HUMBLE ABODE COUPON" would get back a list of search results. The number-one result from the "HUMBLE ABODE COUPON" Yahoo! search in the searches set out in Exhibit I was a link to BuyingFurniture.com.  The number-two result from the "HUMBLE ABODE COUPON" Yahoo! search is also Buying-furniture.biz, an Internet website which is identical in content to BuyingFurniture.com.

By use of the Yahoo! Internet search engine, an Internet user inputting the search term "HUMBLE ABODE SAVINGS" would get back a list of search results. The number-one result from the "HUMBLE ABODE SAVINGS" Yahoo! search was a link to Buying-furniture.biz, an Internet website which is identical in content

33

to  BuyingFurniture.com.    The  number-three  result  from  the
"HUMBLE ABODE SAVINGS" Yahoo! search was TotalBedroom.com.

     By  use  of  the  Yahoo!  Internet  search  engine,  an  Internet
user  inputting  the  search  term  "HUMBLE ABODE DISCOUNT"  got  back
a  list  of  search  results,  of  which  number  six  was  a  link  to
BuyingFurniture.com.    Number  seven  is  the  actual  website  for
Humble  Abode.    Finally,  as  set  out  above,  users  on  the  various
plaintiff  websites  were  able  to  search  for  Humble  Abode  product
names  on  these  websites  themselves.

     2. **Plaintiff has engaged in infringement through palming off**
     The  use  of  a  competitor's  trademarks  to  sell  one's  own
products  is  trademark  infringement.    This  is  not  a  mere  case  of
"initial  interest  confusion,"  which  is  recognized  in  this
District,  *Jews for Jesus v. Brodsky*,  993  F.  Supp.  282,  where  a
trademark  owner  claims  damage  because  a  competitor  has  used  a
trademark  merely  to  hail  customers  to  his  store  or  website.    In
such  cases,  there  is  no  confusion  by  the  time  the  transaction  is
complete;  nonetheless,  the  courts  have  found,  as  they  would  find
here,  that  the  use  of  the  trademark  owner's  mark  is  actionable
under  the  Lanham  Act.

     Here,  however,  besides  a  small  disclaimer  on  the  very  front
page  of  his  website,  which  as  demonstrated  above  constitutes
more  of  an  admission  of  liability  than  a  guard  against  it,
reasonable  customers  actually  had  little  or  no  idea  that  they
were  not  buying  "Humble  Abode  furniture,"  just  as  they  were

34

promised they could do by the advertising that brought them to the website.   There is no disclaimer during the purchasing process; no disclosure that customers are buying substitute furniture that Steve Ross has decided is "the same" furniture as that being provided by Humble Abode either in the selection process nor in the checkout process.   In sum, it is classical palming off, and the fact that plaintiff is using a website to do it does not turn palming off into "comparative advertising."

> 1) **Plaintiff's unfair competition is not mitigated by its use of a disclaimer**

Humble Abode can fairly anticipate one defensive argument of plaintiff – that its use of a disclaimer, which was done upon an attorney's instructions, vitiates or at least mitigates the confusion that may have been caused by its websites.   In fact, to the contrary, the voluntary act of placing a disclaimer on one's own packaging constitutes a tacit admission that the use of plaintiff's trademarks, in the entire context of the sales environment, is likely to confuse consumers.

This Court has explicitly found that a disclaimer of affiliation on the first screen of a website far more prominent than the one used by plaintiff here has no effect on mitigating likelihood of confusion in a trademark action. *Jews for Jesus*, 993 F. Supp. at 303.   Other courts have found such disclaimers "wholly inadequate to prevent consumer confusion" and have ruled that they "suggest[] a calculated effort by defendants to escape liability for infringement," *Conopco, Inc. v. May Dept. Stores*

35

*Co.*, 784 F.Supp. 648, 683 (E.D. Mo.), *rev'd on other grounds*, 46 F.3d 1556 (Fed. Cir. 1994), *citing*, *Charles of the Ritz v. Quality King,* 636 F.Supp. 433, 437 (S.D.N.Y. 1986); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1093 and n. 9 (7th Cir.1988), *Charles of the Ritz v. Quality King,* 664 F.Supp. 152, 155-56 (S.D.N.Y.), *aff'd,* 832 F.2d 1317 (2d Cir. 1987); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1316 (2d Cir.1987).

Based on this authority, the use of the Trademark Acknowledgment by plaintiff is unavailing as a factor lessening confusion and, in this particular case, *adds* to the confusion. For all the Trademark Acknowledgment here does is state the truism that "Humble Abode and product names are trademarks of HumbleAbode.com, LLC" – precisely the sort of statement a consumer might well expect to see on the *Humble Abode* website. Far from a disclaimer that explicitly announces the website's lack of affiliation with the trademark owner, which this Court ruled in *Jews for Jesus* was of no help to the infringer, this "disclaimer" arguably only increased confusion.[5]

_____

[5] When printed out utilizing standard settings on a Microsoft Internet Explorer 6.0 Internet browser, the product offerings on TotalBedroom.com's home page extended over nine printed 8½ x 11 pages, of which only the first bears the gray Trademark Acknowledgment. See Exhibit B of the Answer. When the user selected one of the Humble Abode products pictured at the TotalBedroom.com "Price Comparison" page, the initial screen image that appeared shows a photograph of the product selected – again, using the given HA Furniture Mark. The Trademark Acknowledgment is found only at the bottom of the page, seen by the

36

**e. Plaintiff's filing of a meritless lawsuit constituted unfair competition under the Lanham Act and New Jersey law**

Under trademark law, the filing of baseless litigation constitutes unfair competition. What could be a more severe method of unfair competition than to hale a competitor into court – in this case, one a continent away from home – and assert frivolous claims against him? The case law and analysis above provide ample authority for defendant's contention that plaintiff itself engaged in unfair competition, and that there is no possible basis for any of its legal claims in this matter. The only reason it was filed was as a means of unfair competition – a type the courts recognize as actionable.

"A claim of trademark infringement must be carefully scrutinized to ensure that trademarks and the threat of trademark litigation is not, in essence, used in restraint of trade." *Puritan Sportswear Corp. v. Shure*, 307 F.Supp. 377 (W.D. Pa. 1969). Thus "if suit is used 'as a deliberate weapon of business aggression rather than an instrument for adjudicating honest disputes,' then it is an unfair method of competition." *T.N. Dickinson Co. v. LL Corp.*, 985 WL 14175, *7,

---

consumer only if he chooses to scroll down to the bottom of the screen. A printout of a typical screen presentation is Exhibit C to the Answer.

Ultimately, when the user is ready to make a purchase and proceeds to "check out" on TotalBedroom.com, the HA Furniture Marks again appeared. Customers were not informed that they were receiving "generic" furniture from the same manufacturer which plaintiff happens to believe is "the same" as Humble Abode furniture. A printout of a typical display is attached as Exhibit D.

227 U.S.P.Q. 145 (D. Conn. 1985), quoting R. Callman, <u>Unfair</u>
<u>Competition, Trademarks and Monopolies</u>, §2.32 (4th Ed. 1981).
Furthermore, "malicious or excessive threats which go to
companies whose activities could not possibly be considered as
infringing . . . might be construed as an effort to extend a
trademark monopoly beyond its legal limits." <u>LaMaur, Inc. v.</u>
<u>Alberto-Culver Co.</u>, 1973 WL 917, *2, 179 U.S.P.Q. 607 (D.
Minn.), *aff'd*, 496 F.2d 618 (8th Cir. 1974). This is all the
more so when there is no plausible trademark to enforce, as in
the case of TOTAL BEDROOM. Plaintiff's Lanham Act claims, filed
without any review by a plaintiff who sought anonymity and who
could never seriously believe he had a trademark to enforce,
exemplify the rare case of actionable unfair competition by
litigation.

### f. Defendant can prove damages caused by plaintiff's conduct

Obviously none of the foregoing matters if there have been
no damages to Humble Abode. But there have been, especially as
damages are measured under the Lanham Act, and they are quite
substantial.

Under the Lanham Act, a successful claimant is entitled to
recovery of "any damages sustained by the plaintiff" to be
"assessed by the Court or under the Court's discretion." 15
U.S.C. § 1117(a). Although a party's trademark damages
frequently cannot be calculated with exact specificity, the
Lanham Act authorizes damages even when they are not susceptible

to precise calculations. *Travelodge Hotels, Inc. v. Elkins Motel Associates, Inc*., Slip Copy, 2005 WL 2656676 (D.N.J., Oct 18, 2005), citing *Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1565 (11th Cir.1987). As the Third Circuit has explained,

> Section 35(a) permits a plaintiff to recover, "subject to the principles of equity ..., (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." As the Second Circuit observed . . . , an accounting of the infringer's profits is available if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement. These rationales are stated disjunctively; any one will do.

*Banjo Buddies, Inc. v. Renosky* 399 F.3d 168, 178 (3rd Cir. 2005) (internal citations omitted).

A proper determination of damages may require additional discovery and a hearing. But for purposes of this motion, we note again that the Isley Declaration shows that for the single 365-day period shown in Yahoo!'s analysis of the TotalBedroom.com website (which operates on the Yahoo! Internet retail platform), the company had approximately $1.5 million in sales. Comparison of the products sold, compared against the list set out in footnote 2 of HA Furniture Marks, indicates that $122,317 of those sales, in a single year, was for merchandise sold utilizing the HA Furniture Marks.

This figure, however, does not even account for the likelihood that some or all of the sales generated from TotalBedroom.com and the related sites can be traced to

customers driven there by plaintiff's deceptive use of both the HUMBLE ABODE mark and the HA Furniture Marks.  It is, however, the minimum quantum of damages of this case, which will have to be fleshed out to cover the relevant period of the litigation and which may be adduced by further Court ordered discovery solely for the purpose of assessing damages, along with other appropriate measures of damages as the Court may see fit.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court order summary judgment dismissing all the claims of the Complaint, and in favor of defendant Humble Abode as to counts Two, Three and Four of the Counterclaims / Third-Party Complaint (incorrectly designated as Cross-Claims).

Ronald D. Coleman (RC 3875)
Jane Coleman
COLEMAN LAW FIRM
A Professional Corporation
Attorneys for Defendants
Humble Abode, LLC, James L.
  Wickersham and Kris Kitterman
881 Allwood Road
Clifton, New Jersey  07012
(973) 471-4010

Dated:  February 23, 2006

40